JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gilbert, Jeffrey derivatively on behalf of SYNCHRONY FINANCIAL,

**(b)** County of Residence of First Listed Plaintiff **Broward County, FL**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Eric P. Smith, Esq., Faxon Law Group, LLC., 59 Elm Street, New Haven, CT 06510, (203)624-9500

## DEFENDANTS

Synchrony Financial, Keane, Margaret, Doubles, Brian, Alves, Paget, Coviello, Arthur Jr., Graylin, William, Guthrie, Roy, Hartnack, Richard, Naylor, Jeffrey, Richie, Laurel & Snowe, Olympia

County of Residence of First Listed Defendant **Fairfield, County, CT**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331

Brief description of cause:
Shareholder Derivative Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE 1-28-2019

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JEFFREY GILBERT, derivatively on behalf of SYNCHRONY FINANCIAL, | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| MARGARET M. KEANE, BRIAN D. DOUBLES, PAGET L. ALVES, ARTHUR W. COVIELLO, JR., WILLIAM W. GRAYLIN, ROY A. GUTHRIE, RICHARD C. HARTNACK, JEFFREY G. NAYLOR, LAUREL J. RICHIE, and OLYMPIA J. SNOWE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SYNCHRONY FINANCIAL, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Jeffrey Gilbert ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Synchrony Financial ("Synchrony" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Margaret M. Keane, Brian D. Doubles, Paget L. Alves, Arthur W. Coviello, Jr., William W. Graylin, Roy A. Guthrie, Richard C. Hartnack, Jeffrey G. Naylor, Laurel J. Richie, and Olympia J. Snowe (collectively, the "Individual Defendants," and together with Synchrony, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Synchrony, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the

following based upon personal knowledge as to himself and him own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Synchrony, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Synchrony's directors and officers from October 21, 2016 through the present (the "Relevant Period").

2.      Synchrony is a consumer financial services company that delivers customized financing programs across industries including retail, health, auto, travel and home, along with consumer banking products.  The Company provides a range of credit products through its financing programs which it has established with a diverse group of national and regional retailers, local merchants, manufacturers, buying groups, industry associations, and healthcare service providers.

3.      Synchrony offers its credit products primarily through its wholly-owned subsidiary, Synchrony Bank.  Through Synchrony Bank, the Company additionally offers a range of deposit products insured by the Federal Deposit Insurance Corporation directly to retail and commercial customers.

Verified Shareholder Derivative Complaint

4.      Synchrony is a leading provider of private label credit cards, issuing store-branded credit cards from retailers including Amazon and Lowe's.  As a provider of private label credit cards, Synchrony assumes all the credit risk on the credit cards it issues.  The Company's compliance with relevant underwriting policies is thus highly material to its operations and future success.

5.      Higher-risk borrowers comprise an important part of the Company's store-branded credit card business.  The Company's private label credit cards are typically easier for borrowers to obtain relative to the conventional credit cards issued by banks.  Moreover, in light of Synchrony's retail partners' business demographics, the Company's store-branded credit cards often attract a larger portion of riskier borrowers.

6.      The Company's stock price and balance sheet can be significantly affected by declines in the credit quality of the Company's loan portfolio.  Per U.S. Generally Accepted Accounting Principles and standards set by the Financial Accounting Standards Board, Synchrony is required to set aside a reserve or assets for probable losses on loans.  The Company is also subject to rigorous liquidity, capital, and leverage ratio requirements.

7.      If the credit quality of the Company's loan portfolio worsens, then the Company must increase provisions for loan losses which in turn affect Synchrony's net income.

8.      On April 28, 2017, the Company filed a Form 8-K with an attached press release announcing disappointing financial results for the Company's first fiscal quarter ended March 31, 2017.  The press release specifically stated, *inter alia*, that the Company's net income had fallen 14% from the previous year.  Moreover, the Company blamed its performance on the poor credit profile of the Company's loan portfolio and disclosed that net charge-offs had increased to $974 million, resulting in the highest charge-off rate reported by the Company since at least 2012.  The

press release also noted that additional charge-offs were on the horizon and that Synchrony increased its loan loss reserve to $1.3 billion—a 21% increase over the preceding quarter.

9.      On this news, the price per share of Synchrony common stock fell $5.25, or approximately 15.9%, from the previous day's closing price, closing at $27.80 per share on April 28, 2017.

10.     During the Relevant Period, the Individual Defendants caused the Company to: (1) fail to maintain disciplined or consistent underwriting practices; (2) relax its underwriting standards but increasingly market, offer, and extend its private label credit cards to riskier borrowers to maintain growth—particularly loan receivable growth, resulting in Synchrony's loan portfolio having greater credit risk than what was presented to the investing public and a significantly higher likelihood of defaults, reserves, and charge-offs; (3) fail to have a loan portfolio with "stable asset quality" and to fail to focus on a higher quality asset base; and (4) fail to account for Synchrony's worsening loan portfolio properly (collectively, the "Underwriting Misconduct").

11.     Moreover, in breach of their fiduciary duties, the Individual Defendants caused the Company to make false and/or misleading statements concerning the Company's underwriting and accounting practices that failed to disclose that: (1) Synchrony was engaged in the Underwriting Misconduct; (2) Synchrony set inadequate reserves for probable loan losses; (3) the Company's relaxed underwriting practices led to a deterioration in the credit quality of its loan portfolios; (4) the Company anticipated significant charge-offs across its whole portfolio; (4) Synchrony overstated its net earnings; (5) the Company's significant changes in its underwriting guidelines between mid-2016 and the beginning of 2017 negatively impacted its relationships with key retail partners; and (6) the Company failed to maintain internal controls.

Verified Shareholder Derivative Complaint

12.     The Company subsequently changed its underwriting practices, which had a negative effect on its relationships with key retail partners, including Walmart, the Company's most significant credit card program partner at the time.

13.     On July 12, 2018, *The Wall Street Journal*, in addition to other media outlets, reported in an article that Walmart was contemplating a move of its branded credit card business to Capital One and away from Synchrony.

14.     On this news, the price per share of Synchrony stock fell $1.84, or 5.3%, from the previous day's closing price, closing at $32.96 on July 12, 2018.

15.     On July 26, 2018, Walmart announced that it and Capital One entered into a new, long-term credit card program agreement where Capital One would be the exclusive issuer of Walmart credit cards.

16.     On this news, the price per share of Synchrony stock fell $3.44, or 10.3% from the previous day's trading price, closing at $30.00 per share on July 26, 2018.

17.     On November 1, 2018, Walmart initiated an action against Synchrony in the United States District Court for the Western District of Arkansas, alleging that the Company, *inter alia*, intentionally underwrote its credit card program with Walmart in a manner exposing the program to significant unique credit risk (the "Walmart Action").

18.     On this news, the price per share of Synchrony stock fell $3.01, or 10.2%, from the previous day's trading price, closing at $26.43 per share on November 2, 2018.

19.     The Individual Defendants breached their fiduciary duties by willfully or recklessly making and/or causing the Company to make false and misleading statements concerning new underwriting practices and their impact on relationships with the Company's retail partners, which failed to disclose that: (1) the Company failed to maintain disciplined or consistent underwriting

practices; (2) Synchrony made significant changes to its underwriting practices, including limiting credit line increases, modifying its new account acquisition strategies, and lowering existing credit lines; (3) Synchrony's new underwriting practices dissatisfied key retail partners, including Walmart and thus damaged the Company's relationships with key retail partners; (4) the Company's partnership with Walmart was in jeopardy as a result of the Company's underwriting changes; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact to the investing public.

21.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while two of them engaged in insider sales, netting proceeds of over $2 million. Approximately 108.2 million shares of the Company's common stock were repurchased at inflated prices between November 2016 and September 2018, inclusive, for over $3.5 billion. As the Company's common stock was actually only worth $25.32 per share, the price at which it was trading on November 20, 2018, the Company overpaid approximately $805.1 million in total.

22.     In light of the Individual Defendants' misconduct, which has subjected Synchrony, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Connecticut (the "Securities Class Action"), and Synchrony to the Walmart Action, the need to undertake internal investigations, the Company's being the subject of

internal and outside investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Synchrony Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

25.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Verified Shareholder Derivative Complaint

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with headquarters in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Synchrony common stock. Plaintiff has continuously held Synchrony common stock at all relevant times.

### Nominal Defendant Synchrony

31.     Synchrony is a Delaware corporation with its principal executive offices at 777 Long Ridge Road, Stamford, Connecticut 06902. Synchrony common stock trades on the NYSE under the ticker symbol "SYF."

### Defendant Keane

32.     Defendant Margaret M. Keane ("Keane") has served as Synchrony's President and CEO since February 2014 and has served as a Company director since 2013.  According to the Company's Schedule 14A filed with the SEC on April 4, 2018 (the "2018 Proxy Statement"), as of March 22, 2018, Defendant Keane beneficially owned 195,809 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Keane owned over $6.6 million worth of Synchrony stock.

33.     For the fiscal year ended December 31, 2017, Defendant Keane received $13,525,503 in compensation from the Company. This included $1,168,654 in salary, $7,800,060 in stock awards, $1,199,408 in option awards, $2,655,500 in non-equity incentive plan awards, and $701,881 in all other compensation.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Keane made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 15, 2018 | 13,138 | $36.70 | $482,164.60 |
| February 28, 2017 | 11,500 | $36.13 | $415,495.00 |
| November 22, 2016 | 6,000 | $34.00 | $204,000.00 |
| November 9, 2016 | 2,000 | $30.00 | $60,000.00 |
| May 24, 2016 | 1,000 | $30.00 | $30,000.00 |

Thus, in total, before the fraud was exposed, she sold 33,638 Company shares on inside information, for which she received approximately $1.2 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

35.     The Company's 2018 Proxy Statement stated the following about Defendant Keane:

> Ms. Keane, 58, has been our President and CEO since February 2014 and previously served as CEO and President of GE's North American retail finance business since April 2011. She has also been a member of the Board since 2013 and a member of the board of directors of Synchrony Bank (the "Bank") since 2009. From June 2004 to April 2011, Ms. Keane served as President and CEO of the Retail Card platform of GE's North American retail finance business. From January 2002 to May 2004, Ms. Keane served as Senior Vice President of Operations of the Retail Card platform of GE's North American retail finance business. From January 2000 to December 2001, Ms. Keane served as Chief Quality Leader of GE Capital Corporation ("GECC"). From October 1999 to December 1999, Ms. Keane served as Shared Services Leader for GECC's Mid-Market Leasing Businesses. Prior to that, Ms. Keane served in various operations and quality leadership roles at GECC and Citibank. Ms. Keane serves on the board of directors of The Allstate

Corporation, a publicly held personal lines insurer. Ms. Keane received a B.A. in Government and Politics and an M.B.A. from St. John's University.

We believe that Ms. Keane should serve as a member of the Board due to her extensive experience in the retail finance business and the perspective she brings as our President and CEO.

**Defendant Doubles**

36.    Defendant Brian D. Doubles ("Doubles") has served as Synchrony's Executive Vice President and CFO since February 2014.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Doubles beneficially owned 38,491 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Doubles owned approximately $1.3 million worth of Synchrony stock.

37.    For the fiscal year ended December 31, 2017, Defendant Doubles received $4,195,484 in compensation from the Company. This included $750,000 in salary, $2,164,536 in stock awards, $205,402 in option awards, $847,500 in non-equity incentive plan awards, and $228,046 in all other compensation.

38.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Doubles made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 15, 2018 | 6,569 | $36.70 | $241,082.30 |
| February 28, 2017 | 8,109 | $36.13 | $292,978.17 |
| November 22, 2016 | 6,000 | $34.00 | $204,000.00 |
| November 9, 2016 | 2,000 | $30.00 | $60,000.00 |
| May 24, 2016 | 1,000 | $30.00 | $30,000.00 |

Thus, in total, before the fraud was exposed, he sold 23,678 Company shares on inside information, for which he received approximately $828,060. His insider sales made with knowledge of material

non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Doubles:

> Mr. Doubles, 42, has been our Executive Vice President and CFO since February 2014 and has served as CFO of GE's North American retail finance business since January 2009 and a member of the board of directors of the Bank since 2009. From July 2008 to January 2009, Mr. Doubles served as Vice President of Financial Planning and Analysis of GE's global consumer finance business. From March 2007 to July 2008, Mr. Doubles led the wind-down of GE's U.S. mortgage business as CFO and subsequently as CEO. From May 2006 to March 2007, Mr. Doubles served as Vice President of Financial Planning and Analysis of GE's North American retail finance business. From January 2001 to May 2006, Mr. Doubles served in roles of increasing responsibility for GE's internal audit staff. From February 1998 to January 2001, Mr. Doubles held various roles as part of a General Electric Company ("GE") management leadership program. Mr. Doubles received a B.S. in Engineering from Michigan State University.

**Defendant Alves**

40.     Defendant Paget L. Alves ("Alves") has served as a Company director since November 2015 and serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Alves beneficially owned 2,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Alves owned $67,460 worth of Synchrony stock.

41.     For the fiscal year ended December 31, 2017, Defendant Alves received $246,043 in compensation from the Company. This included $111,000 in fees earned or cash paid and $135,043 in stock awards.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Alves:

Mr. Alves, 63, has been a director since November 2015 and was a non-voting Board observer from July 2015 to November 2015. He has also been a

member of the board of directors of the Bank since January 2017. He served as Chief Sales Officer of Sprint Corporation, a wireless and wireline communications services provider, from January 2012 to September 2013 after serving as President of that company's Business Markets Group from 2009 to 2012. Prior thereto, Mr. Alves held various positions at Sprint Corporation, including President, Sales and Distribution, from 2008 to 2009; President, South Region, from 2006 to 2008; Senior Vice President, Enterprise Markets, from 2005 to 2006; and President, Strategic Markets, from 2003 to 2005. Between 2002 and 2003, he served as President and Chief Operating Officer of Centennial Communications Corporation and from 2000 to 2001 served as President and CEO of PointOne Telecommunications, Inc. Mr. Alves currently serves on the boards of directors of Yum! Brands, Inc., a company that develops, operates, franchises, and licenses a system of quick-service restaurants; International Game Technology PLC, a manufacturer and distributor of microprocessor-based gaming and video lottery products and software systems; and Ariel Investments LLC, an investment management company. He previously served on the boards of directors of GTECH Holdings Corporation from 2005 to 2006, Herman Miller, Inc. from 2008 to 2010 and International Game Technology Inc. from 2010 to 2015. Most recently, *Savoy* magazine recognized Mr. Alves among *Savoy*'s 2017 Most Influential Black Corporate Directors. Mr. Alves received a B.S. in Industrial and Labor Relations and a J.D. from Cornell University.

We believe that Mr. Alves should serve as a member of the Board due to his executive management and leadership experience, including leadership roles with technology companies, his extensive background in sales, his financial expertise and his experience with strategic and business development. He also has experience with strategic corporate transactions, including mergers and acquisitions.

### **Defendant Coviello**

43.     Defendant Arthur W. Coviello, Jr. ("Coviello") has served as a Company director since November 2015 and serves as a member of the Risk Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Coviello beneficially owned 6,186 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Coviello owned approximately $208,653 worth of Synchrony stock.

44.     For the fiscal year ended December 31, 2017, Defendant Coviello received $228,043 in compensation from the Company. This included $93,000 in fees earned or cash paid and $135,043 in stock awards.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Coviello:

> Mr. Coviello, 64, has been a director since November 2015 and was a non-voting Board observer from July 2015 to November 2015. He has also been a member of the board of directors of the Bank since January 2017. Since 2015 he has been an independent cyber security consultant. He served as Executive Vice President of EMC Corporation, a cloud computing and information security company, and Executive Chairman of RSA Security, Inc. ("RSA"), the Security Division of EMC Corporation and a provider of security, risk and compliance solutions, from 2011 to 2015, after serving as Executive Vice President and President of RSA from 2006 to 2011. Prior thereto, Mr. Coviello held various executive positions at RSA, including President and CEO from 2000 to 2006, and President from 1999 to 2000. Prior to RSA, he had extensive financial and operating management expertise in several technology companies. Mr. Coviello currently serves on the boards of directors of three private companies, Cylance, Inc., which applies artificial intelligence, algorithmic science and machine learning to cyber security; Capsule8, a security software platform for Linux, containers and microservices; and Bugcrowd, Inc., which uses tens of thousands of independent researchers to assist its customers in finding security vulnerabilities in their software. Mr. Coviello previously served on the boards of directors of EnerNOC, Inc., Gigamon, Inc., AtHoc, RSA and Sana Security, Inc. He received a B.B.A. in Accounting from the University of Massachusetts.
>
> We believe that Mr. Coviello should serve as a member of the Board due to his leadership experience, including as CEO of a publicly traded company, his extensive financial expertise and accounting background and his considerable experience in technology and cyber security.

**Defendant Graylin**

46.     Defendant William W. Graylin ("Graylin") has served as a Company director since November 2015 and serves as a member of the Risk Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Graylin beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on March 22, 2018 was $33.73, Graylin owned $1,686,500 worth of Synchrony stock.

47.     For the fiscal year ended December 31, 2017, Defendant Graylin received $228,043 in compensation from the Company. This included $93,000 in fees earned or cash paid and $135,043 in stock awards.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Graylin:

> Mr. Graylin, 49, has been a director since November 2015 and was a non-voting Board observer from July 2015 to November 2015. He is Chairman of OnVocal Inc., a voice first communications and commerce company. Prior thereto, Mr. Graylin was Global Co-General Manager of Samsung Pay, the mobile payment platform of Samsung Electronics America, Inc., from 2015 to 2018. Between 2012 and 2015, he was CEO of LoopPay, Inc., a mobile payment company; from 2007 to 2012, he was Founder and CEO of Roam Data, Inc., a developer of mobile point of sale software; from 2002 to 2007, he was Founder, Chairman and CEO of Way Systems, Inc.; and from 2000 to 2001, he was Founder and CEO of Entitlenet, Inc. Mr. Graylin served in the United States Navy as a Nuclear Submarine Officer from 1992 to 1998. He currently serves on the boards of directors of several privately held high-tech startups including: Nucleus Scientific, an innovative EV and electrification company; Movylo, Inc., a SaaS-based mobile engagement solution for merchants; People Power, Inc., an IoT (internet of things) services company managed by artificial intelligence ("AI") for home automation, security and senior care; Feelter, crowd-sourced trusted reviews to improve eCommerce conversions; and PushPayments, real-time payment disbursements for businesses. Mr. Graylin is currently a Connection Science Fellow with MIT's Media Lab, where he teaches part time on FinTech and Entrepreneurship. He received a B.S. in Electrical Engineering and Computer Science and a B.A. in Chinese Linguistics and Literature from the University of Washington; an M.B.A. from the Sloan School of Management, Massachusetts Institute of Technology; and an M.S. in Electrical Engineering and Computer Science from Massachusetts Institute of Technology.

> We believe that Mr. Graylin should serve as a member of the Board due to his executive management and leadership experience, and his extensive background as an entrepreneur and innovator in technology.

**Defendant Guthrie**

49.     Defendant Roy A. Guthrie ("Guthrie") has served as a Company director since July 2014 and serves as Chair of the Risk Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Guthrie beneficially owned 13,030 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Guthrie owned approximately $439,501 worth of Synchrony stock.

50.     For the fiscal year ended December 31, 2017, Defendant Guthrie received $263,043 in compensation from the Company. This included $128,000 in fees earned or cash paid and $135,043 in stock awards.

51.     The Company's 2018 Proxy Statement stated the following about Defendant Guthrie:

> Mr. Guthrie, 64, joined our Board and the board of directors of the Bank in connection with our initial public offering in July 2014 (the "IPO"). Since October 2017, Mr. Guthrie has served as CEO of Renovate America Inc., a provider of home improvement financing. From July 2005 to January 2012, Mr. Guthrie served as Executive Vice President, and from July 2005 to May 2011 as CFO of Discover Financial Services, Inc., a direct banking and payments company. From September 2000 to July 2004, Mr. Guthrie served as President and CEO of various businesses of Citigroup Inc., including CitiFinancial International from 2000 to 2004 and CitiCapital from 2000 to 2001. From April 1978 to September 2000, Mr. Guthrie served in various roles of increasing responsibility at Associates First Capital Corporation. Mr. Guthrie serves on the boards of directors of Nationstar Mortgage Holdings, Inc., an originator and servicer of real estate mortgage loans; OneMain Holdings, Inc., a financial services company; and Renovate America Inc. He previously served on the board of directors of LifeLock, Inc., a company offering identity theft protection and detection services, from 2012 to 2017. During his tenure with Discover Financial Services, Inc., he also served on the board of directors of Discover Bank. Mr. Guthrie received a B.A. in Economics from Hanover College and an M.B.A. from Drake University.

> We believe that Mr. Guthrie should serve as a member of the Board due to his leadership experience, including as CFO of two publicly traded companies and as a director of other publicly traded companies, financial expertise and accounting background, risk management experience and extensive experience in consumer finance (including the private-label credit card industry), including more than 30 years of experience in finance and/or operating roles.

**Defendant Hartnack**

52.     Defendant Richard C. Hartnack ("Hartnack") has served as a Company director since July 2014 and serves as Chair of the Management Development and Compensation Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Hartnack beneficially owned 3,354 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Hartnack owned approximately $113,130 worth of Synchrony stock.

53.     For the fiscal year ended December 31, 2017, Defendant Hartnack received $477,117 in compensation from the Company. This included $217,000 in fees earned or cash paid and $260,117 in stock awards.

54.     The Company's 2018 Proxy Statement stated the following about Defendant Hartnack:

> Mr. Hartnack, 72, joined our Board and the board of directors of the Bank in connection with the IPO in July 2014 and serves as the non-executive Chair of the Board. From April 2005 to February 2013, Mr. Hartnack served as Vice Chairman and Head, Consumer and Small Business Banking of U.S. Bancorp, a financial services holding company. From June 1991 to March 2005, Mr. Hartnack served in various leadership roles at Union Bank, N.A. (formerly known as Union Bank of California, N.A.), including Vice Chairman, Director and Head, Community Banking and Investment Services from 1999 to 2005. From June 1982 to May 1991, Mr. Hartnack served in various leadership roles at First Chicago Corporation, including Executive Vice President and Head, Community Banking. Mr. Hartnack previously served on the boards of directors of Federal Home Loan Mortgage Corporation, MasterCard International, Inc. (U.S. Region), and UnionBanCal Corporation. Mr. Hartnack received a B.A. in Economics from the University of California, Los Angeles, and an M.B.A. from Stanford University.
>
> We believe that Mr. Hartnack should serve as a member of the Board due to his leadership experience and extensive background in consumer finance, banking and financial services regulatory matters that he accumulated over the course of a 40-year career in the banking industry.

**Defendant Naylor**

55.     Defendant Jeffrey G. Naylor ("Naylor") has served as a Company director since July 2014 and serves as Chair of the Audit Committee and as a member of the Management Development and Compensation Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Naylor beneficially owned 30,030 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Naylor owned over $1 million worth of Synchrony stock.

56.     For the fiscal year ended December 31, 2017, Defendant Naylor received $279,043 in compensation from the Company. This included $144,000 in fees earned or cash paid and $135,043 in stock awards.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Naylor:

> Mr. Naylor, 59, joined our Board and the board of directors of the Bank in connection with the IPO in July 2014. From February 2013 to April 2014, Mr. Naylor served as Senior Corporate Advisor of the TJX Companies, Inc., a retail company of apparel and home fashions. From January 2012 to February 2013, Mr. Naylor served as Senior Executive Vice President and CAO of the TJX Companies, Inc.; from February 2009 to January 2012, he served as its Senior Executive Vice President, Chief Financial and Administrative Officer; from June 2007 to February 2009, he served as its Senior Executive Vice President, Chief Administrative and Business Development Officer; from September 2006 to June 2007, he served as its Senior Executive Vice President, Chief Financial and Administrative Officer; and from February 2004 to September 2006, he served as its CFO. From September 2001 to January 2004, Mr. Naylor served as Senior Vice President and CFO of Big Lots, Inc. From September 2000 to September 2001, Mr. Naylor served as Senior Vice President, Chief Financial and Administrative Officer of Dade Behring, Inc. From November 1998 to September 2000, he served as Vice President, Controller of The Limited, Inc. Mr. Naylor serves on the boards of directors of Dollar Tree, Inc., an operator of discount variety stores; Wayfair, Inc., an e-commerce company that sells home goods; Save-A-Lot, a grocery retailer; Emerald Expositions, a company that conducts business and consumer trade shows; and Bargain Hunt, a discount retailer. Mr. Naylor received a B.A. in Economics and Political Science and an M.B.A. from the J.L. Kellogg Graduate School of Management, Northwestern University.

We believe that Mr. Naylor should serve as a member of the Board due to his executive management and leadership experience, including as CFO of a publicly traded company and as a director of other publicly traded companies, his extensive financial expertise and accounting background, and his considerable experience accumulated over the course of 25 years in the retail and consumer goods industries.

**Defendant Richie**

58.    Defendant Laurel J. Richie ("Richie") has served as a Company director since November 2015 and serves as a member of the Nominating and Corporate Governance Committee and the Management Development and Compensation Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Richie beneficially owned 1,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Richie owned $33,730 worth of Synchrony stock.

59.    For the fiscal year ended December 31, 2017, Defendant Richie received $236,043 in compensation from the Company. This included $101,000 in fees earned or cash paid and $135,043 in stock awards.

60.    The Company's 2018 Proxy Statement stated the following about Defendant Richie:

Ms. Richie, 59, has been a director since November 2015 and was a non-voting Board observer from July 2015 to November 2015. Ms. Richie served as President of the Women's National Basketball Association LLC, a professional sports league, from 2011 to 2015. Prior to her appointment in 2011, she served as Chief Marketing Officer of Girl Scouts of the United States of America from 2008 to 2011. From 1984 to 2008, she held various positions at Ogilvy & Mather, including Senior Partner and Executive Group Director and founding member of the agency's Diversity Advisory Board. Ms. Richie was named one of the 25 Most Influential Women in Business by The Network Journal and she is the recipient of numerous awards including the Black Girls Rock Shot Caller Award, Sports Business Journal's Game Changer Award, and the YMCA Black Achievers in Industry Award. She was also awarded Ebony magazine's Outstanding Women in Marketing and Communications Award, and named to its Power 100 List. Black Enterprise magazine named Ms. Richie one of the Most Influential African Americans in Sports and Savoy magazine recognized her among its 2017 Most Influential Black Corporate Directors. Ms. Richie earned a B.A. in Policy Studies

from Dartmouth College. Ms. Richie is a former Trustee of the Naismith Basketball Hall of Fame and was named a Charter Trustee of her alma mater in 2012 and became Chair of the Board of Trustees of Dartmouth College in 2017. Ms. Richie also currently advises Teach for America on organizational alignment and brand strategy.

We believe that Ms. Richie should serve as a member of the Board due to her executive management and leadership experience and her considerable experience in communications and marketing.

### Defendant Snowe

61.     Defendant Olympia J. Snowe ("Snowe") has served as a Company director since November 2015 and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.  According to the 2018 Proxy Statement, as of March 22, 2018, Defendant Snowe beneficially owned 3,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 22, 2018 was $33.73, Snowe owned $101,190 worth of Synchrony stock.

62.     For the fiscal year ended December 31, 2017, Defendant Snowe received $266,043 in compensation from the Company. This included $131,000 in fees earned or cash paid and $135,043 in stock awards.

63.     The Company's 2018 Proxy Statement stated the following about Defendant Snowe:

> Senator Snowe, 71, has been a director since November 2015 and was a non-voting Board observer from January 2015 to November 2015. She has also been a member of the board of directors of the Bank since January 2017. She is currently Chairman and CEO of Olympia Snowe, LLC, a policy and communications consulting firm, and a senior fellow at the Bipartisan Policy Center, a non-profit organization focused on national policy solutions, where she is a member of the board and co-chairs its Commission on Political Reform. Senator Snowe served in the U.S. Senate from 1995–2013, and as a member of the U.S. House of Representatives from 1979–1995. While in the U.S. Senate, she served as Chair and was the ranking member of the Senate Committee on Small Business and Entrepreneurship, and served on the Senate Finance Committee, the Senate Intelligence Committee, and the Senate Commerce Science and Technology

Committee. She also served as Chair of the Subcommittee on Seapower for the Senate Armed Services Committee. Senator Snowe received recognition from the National Association of Corporate Directors as an NACD Directorship 100 "Class of 2015." Senator Snowe serves on the boards of directors of T. Rowe Price Group, Inc., a financial services company, and Aetna, Inc., a diversified healthcare benefits company. Senator Snowe received a B.A. in political science from the University of Maine and has received honorary doctorate degrees from many colleges and universities.

We believe that Senator Snowe should serve as a member of the Board due to her broad range of valuable leadership and public policy experience, including more than 30 years as an elected member of the U.S. Congress. Her experiences provide her with an extensive background handling complex issues, including budget and fiscal responsibility, economic, tax and regulatory policy, and health care policy.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64. By reason of their positions as officers, directors, and/or fiduciaries of Synchrony and because of their ability to control the business and corporate affairs of Synchrony, the Individual Defendants owed Synchrony and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Synchrony in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Synchrony and its shareholders so as to benefit all shareholders equally.

65. Each director and officer of the Company owes to Synchrony and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Synchrony, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of Synchrony were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Synchrony, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Synchrony's Board at all relevant times.

69.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual

Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

70.    To discharge their duties, the officers and directors of Synchrony were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Synchrony were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Connecticut, Delaware, and the United States, and pursuant to Synchrony's own code of conduct;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Synchrony conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Synchrony and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Synchrony's operations would comply with

all applicable laws and Synchrony's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.     Each of the Individual Defendants further owed to Synchrony and the shareholders the duty of loyalty requiring that each favor Synchrony's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Synchrony and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, and directorial positions with Synchrony, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Synchrony.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

77.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Synchrony, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Synchrony and was at all times acting within the course and scope of such agency.

## SYNCHRONY'S CODE OF CONDUCT

80.     The Company's code of conduct is titled "Our Code" (the "Code of Conduct").  The Code of Conduct states that the policies therein "apply to anyone who works for or represents Synchrony, including all directors, officers and employees across Synchrony, and all companies owned or controlled by Synchrony."

81.     The Code of Conduct states that "[w]e obey the letter—and the spirit—of all laws and regulations."

82.     The Code of Conduct provides, as to "Controllership," that:

Be honest, complete and accurate in our accounting, communications and decision making. Raise a concern if you become aware of actions, transactions, accounting or reporting that are inconsistent with our controllership values and the protection of Synchrony's reputation.

**Our Policy**

- Synchrony accounting and reporting will faithfully reflect the economic substance of the Company's business activities, consistent with generally accepted accounting principles, standards and regulations for accounting and financial reporting.
- Synchrony's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, all Finance Professionals, Administrative Staff in a finance role and all other applicable employees are required to prepare full, fair, accurate, timely, complete and understandable disclosure in reports to management, investors, regulators and other stakeholders.
- Synchrony employees are expected to ensure that management decisions are based on sound economic analysis using complete facts with appropriate consideration of short-term and long-term risks.
- Synchrony employees are expected to comply with all Company policies and applicable laws and regulations relating to the preservation of documents and records. Your Role
- Maintain effective processes and internal controls that fairly reflect transactions or events, as well as prevent or detect inappropriate transactions.

- Maintain accurate, timely and complete records and accounts to appropriately reflect all business transactions.
- Only make travel and expense reimbursements for bona fide expenses that comply with the Company T&E policy and P-Card Procedure.
- Follow all pertinent Company policies, laws and regulations.
- Create documents that are factual, accurate and complete, and follow Company policies in deciding when to retain and dispose of them. Do not alter or destroy any document that you know to be relevant to a pending or reasonably foreseeable litigation, audit, examination or investigation.
- Avoid transactions that diminish shareholder value even if they enhance near-term financial performance.
- Never engage in inappropriate transactions, including those that misrepresent the reporting of other parties such as customers or suppliers.
- Know the controllership "red flags" including:
    - Financial results that seem inconsistent with underlying performance
    - Circumvention of review and approval procedures
    - Incomplete or misleading communications about the substance or reporting of a transaction

83.     The Code of Conduct provides, as to insider trading, that:

Synchrony is committed to the principles of fair and open markets for publicly traded securities throughout the world. Non-public Information is information you may learn in your job about Synchrony or other companies that has not been made public. Some examples of material non-public information are: Financial forecasts; earnings/dividend announcements; proposed acquisitions or divestitures; strategic plans; regulatory actions and changes in top management.

Using material non-public information for your financial or other personal benefit, or sharing it with others, violates Synchrony's Insider Trading Policy and may violate the law.

Non-public information is material if a reasonable investor would consider it important in deciding to buy, hold or sell securities, or if publication would likely affect a company's stock price. Insider Trading means personally buying or selling stock or other securities of any company while in possession of material non-public information about the company. Stock Tipping means sharing material non-public information about Synchrony or another company—for example, to a relative, colleague or friend—so the person may buy or sell stock or other securities of the company on the basis of such information.

**Our Policy**

- Do not engage in Insider Trading or Stock Tipping.
- Never use or share material non-public information for financial or any other personal benefit or for the benefit of another.

Verified Shareholder Derivative Complaint

- Never disclose material non-public information to any unauthorized individual. This often includes employees within the company, but does not apply to protected disclosures to government agencies.
- Any information may be material non-public information regardless of whether it is developed internally or obtained from others (e.g., current or prospective customers, suppliers or business clients). Also, material non-public information may relate to the securities of Synchrony or any other company (such as a client or supplier).

84.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Two of the Individual Defendants violated the Code of Conduct by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations.

## **BACKGROUND**

85.     During the Relevant Period, the Individual Defendants caused the Company to fail to maintain disciplined and consistent underwriting practices.

86.     The Individual Defendants caused the Company to engage in the Underwriting Misconduct, which consisted of causing the Company to: (1) fail to maintain disciplined or consistent underwriting practices; (2) relax its underwriting standards but increasingly market, offer, and extend its private label credit cards to riskier borrowers to maintain growth—particularly loan receivable growth, resulting in Synchrony's loan portfolio having greater credit risk than what was presented to the investing public and a significantly higher likelihood of defaults, reserves, and charge-offs; (3) fail to have a loan portfolio with "stable asset quality" and to fail to focus on

a higher quality asset base; and (4) fail to account for Synchrony's worsening loan portfolio properly.

87.     After disclosures concerning the Company began to be disseminated on April 28, 2017, as discussed below, the Company indicated that it had "tightened" credit standards and underwriting policies, which would prevent charge-offs in the future and free up significant capital Synchrony had reserved to cover probable loan losses.  These modifications were significant, despite Synchrony falsely and misleadingly characterizing underwriting changes as "surgical" and "modest," and included tightening up credit line increases, changing its new account acquisition strategies, and decreasing existing credit lines.

88.     These changes, unbeknownst to the investing public, were hurting Synchrony's relationships with its retail partners.

89.     During the majority of the Relevant Period, and extending back nearly two decades, Synchrony's highest revenue-producing account and most important credit program was the Walmart store branded credit card program (the "Walmart Program").  The Walmart Program generated more than $10 billion in annual loan receivables for the Company and comprised 19% of the Company's overall retail card balances.

90.     Throughout 2017, also unbeknownst to the investing public, officials at Walmart expressed complaints to Company executives noting that Synchrony's new credit restrictions were supressing sales growth by denying too great of a number of applicants and also noting that the Company's existing contract with Walmart allowed the Company to retain too much card revenue.

91.     On November 1, 2018, Walmart initiated the Walmart Action against Synchrony, alleging that Synchrony deliberately underwrote the Walmart Program in a way that exposes it to

significant unique credit risk.  In the action, Walmart seeks damages "in an amount . . . estimated to be no less than $800 million."

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements During the Relevant Period

#### *October 21, 2016 Press Release and Form 8-K*

92.     On October 21, 2016, the Company issued a press release also attached to a Form 8-K filed with the SEC, announcing Synchrony's financial results for its fiscal third quarter ended September 30, 2016.  In the press release, Synchrony reported, *inter alia*, net earnings of $604 million and a $986 million provision for loan losses.  Defendant Keane commented on the Company's results, stating, in relevant part:

> Broad-based growth across our sales platforms generated double-digit loan receivables and net interest income growth and strong purchase volume growth this quarter. Organic growth is an important business driver for us and we are pleased to have recently renewed several key relationships. We also signed new partnerships and launched new programs. Strong deposit growth continued this quarter as we remain focused on this important source of funding to support our business . . . .  We are pleased to have initiated our quarterly dividend and share repurchase program during the quarter. We are focusing resources on driving strong organic growth and pursuing new profitable partnership opportunities, while also returning capital to shareholders through dividends and share repurchases—a testament to the strength of our business model and strategic focus.

#### *October 27, 2016 Form 10-Q*

93.     On October 27, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter 2016 (the "3Q 2016 10-Q"), signed by Defendant Doubles.  The 3Q 2016 10-Q affirmed financial results presented in Company's press release issued the same day.  Moreover, the 3Q 2016 10-Q also highlighted the Company's "[s]table asset quality."

94.     Attached to the 3Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Keane and Doubles attesting to the accuracy of the 3Q 2016 10-Q.

*October 21, 2016 Earnings Call*

95.     Also on October 21, 2016, the Company held an earnings call discussing its third quarter results, during which Defendant Keante touted Synchrony's net earnings and net interest income growth.  Also during the call, Defendant Doubles touted Synchrony's "significant growth opportunities," noting that "the credit environment remains favorable."   Doubles moreover attributed Synchrony's growth to "consumers [ ] spending more, they're seeing real value on our cards," and stated that "we feel really good about overall, the fundamentals that we're seeing in growth."

*November 3, 2016 BancAnalysts Association of Boston Conference*

96.     On November 3, 2016, the Company participated in the BancAnalysts Association of Boston Conference, wherein the Company presented slides noting that since at least its third fiscal quarter 2010 through its third fiscal quarter 2016, Synchrony "Focus[ed] on a Higher Quality Asset Base" and maintained "Disciplined Underwriting" which "led to higher quality portfolio."

*January 20, 2017 Press Release and Form 8-K*

97.     On January 20, 2017, the Company issued a press release also attached to a Form 8-K filed with the SEC announcing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2016.  The press release, *inter alia*, reported net earnings of $576 million and a $1.07 billion provision for loan losses.  Defendant Keane touted the Company's results and prospects, stating, in relevant part:

> We are pleased with the significant progress we made in 2016. We generated strong organic growth across our sales platforms which resulted in significant revenue growth, substantial operating leverage, and attractive returns. We also signed and renewed several key relationships, expanded our network, continued to drive digital innovations and analytics capabilities, and supported our business with robust growth in our direct deposit platform. We did this while maintaining a strong balance sheet and returning capital to shareholders through growth and the execution of our initial capital plan which included dividends and share repurchases

. . . .   As we look to 2017, we believe our strategic focus and partner-centric business model position us well for future opportunities and continued growth.

### January 30, 2017 Investor Presentation

98.     On January 30, 2017, the Company filed a Form 8-K attaching as an exhibit the Company's 2016 Fourth Quarter Investor Presentation.  In one of the presentation's slides, the Company noted that since at least its fourth fiscal quarter 2010 through its fourth fiscal quarter 2016, Synchrony "Focus[ed] on a Higher Quality Asset Base" and maintained "Disciplined Underwriting," and that a "[f]ocus on stronger underwriting has led to higher quality portfolio."

### February 23, 2017 Form 10-K

99.     On February 23, 2017, the Company filed its annual report on Form 10-K with the SEC for its fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Keane, Doubles, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe.  The 2016 10-K affirmed financial results presented in the Company's January 20, 2017 press release, and reported $2.25 billion in net earnings and an allowance for loan losses of $4.24 billion for the 2016 fiscal year.  The 2016 10-K additionally noted the Company's "[s]table asset quality" and that "[t]he credit environment remained favorable during 2016."

100.     Moreover, the 2016 10-K noted that the Company complied with critical accounting estimates in preparing its financial statements, stating, in relevant part:

> In preparing our consolidated and combined financial statements, we have identified certain accounting estimates and assumptions that we consider to be the most critical to an understanding of our financial statements because they involve significant judgments and uncertainties. The critical accounting estimates we have identified relate to allowance for loan losses, asset impairment, income taxes and fair value measurements.

101.     As to the Company's allowance for loan losses, the 2016 10-K stated that the Company is required "to make [its] best estimate of probable losses inherent in the portfolio" and

that "[t]he underlying assumptions, estimates and assessments we use to provide for losses are updated periodically to reflect our view of current conditions."

### *February 27, 2017 KBW Cards, Payments & Financial Technology Symposium*

102.    On February 27, 2017, the Company presented at the KBW Cards, Payments & Financial Technology Symposium, during which Defendant Doubles noted the importance of the Company's "very consistent" underwriting guidelines and that Synchrony had not modified its underwriting "significantly over the past 9 to 12 months," stating, in relevant part:

> So what's really important is rather than taking your underwriting guidelines up and down quarter to quarter or year to year, is to be very consistent so that your retailers know what to expect from you.  And that just creates a better partnership.  When, in 2014 and 2015, losses are at historic lows, we didn't take that opportunity to go a lot deeper.  When losses started to normalize, we don't dramatically pull back.  We haven t' really changed our underwriting significantly over the past 9 to 12 months, either.  So I think that consistency point is really important for us.

### *April 4, 2017 Proxy Statement*

103.    On April 4, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Keane, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

104.    The 2017 Proxy Statement stated that the Company has "adopted a Code of Conduct that applies to anyone who works for or represents Synchrony, including all directors, officers and employees."

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

105.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, Synchrony's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

106.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

107.    Moreover, the 2017 Proxy Statement noted that the Company "maintained stable credit metrics and remained disciplined on underwriting" in fiscal 2016.

108.    The statements in ¶¶ 92-102 and the 2017 Proxy Statement were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed and/or caused the Company to fail to disclose that: (1) Synchrony was engaged in the Underwriting Misconduct; (2) Synchrony set inadequate reserves for probable loan losses; (3) the Company's relaxed underwriting practices led to a deterioration in the credit quality of its loan portfolios; (4) the Company anticipated significant charge-offs across its whole portfolio; (4) Synchrony overstated its net earnings; (5) the Company's significant changes in its underwriting guidelines between mid-2016 and the beginning of 2017 negatively impacted its relationships with key retail partners; and (6) the Company failed to maintain internal controls.

**The Truth Emerges as to the Underwriting Misconduct**

*April 28, 2017 Press Release*

109.    On April 28, 2017, the Company issued a press release announcing disappointing financial results for its first fiscal quarter ended March 31, 2017, which revealed the truth about the Company's underwriting practices and the impact they were having on the Company's loan portfolio and business.  The press release, *inter alia*, reported that net income had dropped 14.3%, net charge-offs rose to $974 million, and the Company's charge-off rate was 5.33%, the highest figure reported by the Company in years.

### April 28, 2017 Earnings Call

110.    On April 28, 2017, the Company held an earnings call to discuss its first quarter 2017 results, during which Defendant doubles stated that the Company's underwriting model was not experiencing significant changes, stating, "we haven't made what I would call significant changes to our underwriting model to tighten up.  The changes that we've been making, we'll continue to make, are pretty surgical in nature.  They're specific to certain portfolios or certain credit strategies."

111.    On this news, the price per share of Synchrony stock fell $5.25, or approximately 15.9%, from the previous day's closing price, closing at $27.80 per share on April 28, 2017.

### June 2, 2017 Sanford C. Bernstein Strategic Decision Conference

112.    On June 2, 2017, the Company attended the Sanford C. Bernstein Strategic Decision Conference, wherein Defendant Doubles attempted to assuage concerns regarding Synchrony's underwriting changes, noting that "we did things very surgical, very targeted." During the conference, Defendant Keane was asked ab out the state of competition in the industry by an analyst, to which Defendant Keane stated, "Our whole business model is build around serving our partners," and that the Company was "not afraid of the competition" and that it "ha[s]

a good pipeline."  Moreover, Defendant Keane stated, "We're winning the deals we want and feel good about the overall environment."

113.    Also during the conference, Defendant Kean was asked about "2 big partnerships up in 2019" and these customers potentially leaving the Company, to which Defendant Keane noted that she was "confident" Synchrony would be able to keep them, stating, " My mantra right now inside the company is, right now, our partners need us now more than ever, and we have to be hitting the ball out of the park for them.  So I feel confident we'll continue those relationships." Defendant Keane moreover stated, "I feel pretty confident we'll be able to keep these relationships in our portfolio."

### July 21, 2017 Earnings Call

114.    On July 21, 2017, the Company held an earnings call to discuss its financial results for its second fiscal quarter ended June 30, 2017, during which Defendant Doubles was asked about the progress of renewals of partner contracts expiring in 2019.  Defendant Doubles responded that "we feel pretty positive about the relationships that are coming up, the relationships we've had for a very, very long time" and he was "confident that we'll be able to renew those relationships."

### October 20, 2017 Earnings Call

115.    On October 2017, the Company held an earnings call discussing its financial results for its fiscal third quarter ended September 30, 2017, during which Defendant Keane was asked about "large renewals out in 2019," and stated that Synchrony was "very confident that we'll be able to renew those relationships."  She also stated, "I feel like we have very good relationships right now.  Our partners need us probably more now than ever, given the transformation that's occurring in retail."

### *November 14, 2017 Bank of America Merrill Lynch Future of Financials Conference*

116.    On November 14, 2017, the Company participated in the Bank of America Merrill Lynch Future of Financials Conference, during which Defendant Doubles noted that Synchrony's changes in underwriting standards "weren't dramatic."  Defendant Doubles was asked about how Synchrony deals with the "natural tension" between retailers wanting the Company to extend credit to more customers and the Company's desire to make underwriting standards more strict, to which he responded that Synchrony's interests were "completely aligned" with the interests of its partners.  He continued, "I think that desire to stretch on credit and underwrite deeper is not there today to the same extent as it was pre-crisis.  The other thing you have to remember is that the retailer share arrangement completely aligned our interest with our retail partners, right . . . .  So they have a real incentive not to underwrite deeper as well.  And I think that's something, again, we hear a lot about and was much more of a dialogue pre-crisis than it is today."  Defendant Doubles also noted that the Company's customers "understand credit," "take a longer-term view" concerning underwriting standards, and the Company and its customers were "very much aligned in staying disciplined around underwriting."

### *January 19, 2018 Earnings Call*

117.    On January 19, 2018, the Company held an earnings call to discuss its financial results for its fiscal fourth quarter and year ended December 31, 2017, during which Defendant Keane noted that Synchrony was "not getting any pushback" from its retail partners as a result of its acknowledged underwriting modifications.  She stated, "I think our partners are very cognizant of the fact that they don't want to put credit in the hands of people that can't handle it, and we work very closely with them. In many cases, almost all cases, their names are on the cards. So we work very closely with them, and we are not getting any pushback on credit."  Defendant Doubles

also noted during the call that "these are modest refinements.  These aren't wholesale changes to our underwriting strategy."

### 2018 Proxy Statement

118.    On April 4, 2018, the Company filed the 2018 Proxy Statement.  Defendants Keane, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

119.    The 2018 Proxy Statement stated that the Company has "adopted a Code of Conduct that applies to anyone who works for or represents Synchrony, including all directors, officers and employees."

120.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, Synchrony's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

121.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

122.    The 2018 Proxy Statement also failed to disclose that: (1) the Company failed to maintain disciplined or consistent underwriting practices; (2) Synchrony made significant changes to its underwriting practices, including limiting credit line increases, modifying its new account acquisition strategies, and lowering existing credit lines; (3) Synchrony's new underwriting practices dissatisfied key retail partners, including Walmart and thus damaged the Company's relationships with key retail partners; (4) the Company's partnership with Walmart was in jeopardy as a result of the Company's underwriting changes; and (5) the Company failed to maintain internal controls.

### April 20, 2018 Earnings Call

123.    On April 20, 2018, the Company held an earnings call to discuss its financial results for its first fiscal quarter ended March 31, 2018, during which Defendant Doubles commented on Synchrony's underwriting changes, stating, "we started to make refinements to our underwriting in the second half of 2016, and we continue to see the positive impact of those changes."  Also during the call, Defendant Keane replied to a question about "big renewals" in 2019 by stating that the Company was "well entrenched" with its partners.

### May 31, 2018 Sanford C. Bernstein Strategic Decisions Conference

124.    On May 31, 2018, the Company attended the Sanford C. Bernstein Strategic Decisions Conference, during which Defendant Keane was asked about renewals, and stated, "So I think, one of the things that gives us confidence is the fact that we have very long-term relationships," and that "[w]e work very closely with our partners as renewals are coming up" and "we feel good about where we're positioned competitively right now."

### June 13, 2018 Morgan Stanley Financials Conference

125.    On June 13, 2018, the Company attended the Morgan Stanley Financials Conference, during which Defendant Keane was asked about the Company's relationship with Amazon, to which she stated, " We have a good partnership. . . . I think we have good – Walmart is a good partner."  She was also asked about renewals, to which she responded, "I'm not afraid by our competition.  I think we feel pretty positive about how we built out what we built out," and that "[w]ith the renewals that we're working on, we have great partnerships, great dialogue going on."

126.    The statements in ¶¶ 109-110, 112-117, and 123-125 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed and/or caused the Company to fail to disclose that: (1) the Company failed to maintain disciplined or consistent underwriting practices; (2) Synchrony made significant changes to its underwriting practices, including limiting credit line increases, modifying its new account acquisition strategies, and lowering existing credit lines; (3) Synchrony's new underwriting practices dissatisfied key retail partners, including Walmart and thus damaged the Company's relationships with key retail partners; (4) the Company's partnership with Walmart was in jeopardy as a result of the Company's underwriting changes; and (5) the Company failed to maintain internal controls.

**The Emerges as to the Company's Relationships with its Retail Partners**

*July 12, 2018 Wall Street Journal Article*

127.    On July 12, 2018, *The Wall Street Journal*, in addition to other media outlets, reported in an article that Walmart was contemplating a move of its branded credit card business to Capital One and away from Synchrony.  The article stated that Walmart was not satisfied with Synchrony because Walmart "want[ed] Synchrony to approve a higher percentage of applicants."

Verified Shareholder Derivative Complaint

Moreover, the article noted that executives at Walmart believed that the Company "is keeping too much of the cards' revenue" and that Walmart executives "aired those concerns in a meeting with Synchrony's board last year."

128.    On this news, the price per share of Synchrony stock fell $1.84, or 5.3%, from the previous day's closing price, closing at $32.96 on July 12, 2018.

### July 26, 2018 – Walmart Selects Capital One

129.    On July 26, 2018, Walmart announced that it and Capital One entered into a new, long-term credit card program agreement where Capital One was to become the exclusive issuer of Walmart credit cards.

130.    On this news, the price per share of Synchrony stock fell $3.44, or 10.3% from the previous day's trading price, closing at $30.00 per share on July 26, 2018.

### November 1, 2018 Walmart Litigation

131.    On November 1, 2018, Walmart initiated the Walmart Action, which was reported on by several media outlets, including *The Wall Street Journal*.

132.    On this news, the price per share of Synchrony stock fell $3.01, or 10.2%, from the previous day's trading price, closing at $26.43 per share on November 2, 2018.

### Repurchases During the Relevant Period

133.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $3.5 billion to repurchase 108,163,292 shares of its own common stock at artificially inflated prices from November 2016 through September 2018, inclusive.

134.    As the Company stock was actually only worth $25.32 per share, the price at closing on November 20, 2018, the Company overpaid approximately $805.1 million in total for these repurchases.

135.    According to the Company's Form 10-K filed with the SEC on February 23, 2017, in the month of November 2016, the Individual Defendants caused the Company to repurchase 4,534,485 shares of its own common stock at an average price per share of $29.44, for a total cost to the Company of approximately $133.5 million.

136.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.12 more than the actual worth of each share during the month of November 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of November 2016 was approximately $18.7 million.

137.    According to the Company's Form 10-K filed with the SEC on February 23, 2017, in the month of December 2016, the Individual Defendants caused the Company to repurchase 190 shares of its own common stock at an average price per share of $36.28, for a total cost to the Company of approximately $6,893.

138.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $10.96 more than the actual worth of each share during the month of December 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of December 2016 was approximately $2,082.

139.    According to the Company's Form 10-Q filed with the SEC on May 1, 2017, in the month of January 2017, the Individual Defendants caused the Company to repurchase 5,003,822

shares of its own common stock at an average price per share of $36.16, for a total cost to the Company of approximately $180.9 million.

140.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $10.84 more than the actual worth of each share during the month of January 2017. Thus, the total over payment by the Company for repurchases of its own stock during January 2017 was approximately $54.2 million.

141.    According to the Company's Form 10-Q filed with the SEC on May 1, 2017, in the month of February 2017, the Individual Defendants caused the Company to repurchase 1,586,370 shares of its own common stock at an average price per share of $36.06, for a total cost to the Company of approximately $57.2 million.

142.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $10.74 more than the actual worth of each share during the month of February 2017. Thus, the total over payment by the Company for repurchases of its own stock during February 2017 was approximately $17 million.

143.    According to the Company's Form 10-Q filed with the SEC on May 1, 2017, in the month of March 2017, the Individual Defendants caused the Company to repurchase 87 shares of its own common stock at an average price per share of $34.30, for a total cost to the Company of approximately $2,984.

144.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $8.98 more than the actual worth of each share during the month of March 2017. Thus,

Verified Shareholder Derivative Complaint

the total over payment by the Company for repurchases of its own stock during March 2017 was approximately $781.

145.    According to the Company's Form 10-Q filed with the SEC on July 28, 2017, in the month of April 2017, the Individual Defendants caused the Company to repurchase 122,602 shares of its own common stock at an average price per share of $34.30, for a total cost to the Company of approximately $4.2 million.

146.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $8.98 more than the actual worth of each share during the month of April 2017. Thus, the total over payment by the Company for repurchases of its own stock during April 2017 was approximately $1.1 million.

147.    According to the Company's Form 10-Q filed with the SEC on July 28, 2017, in the month of May 2017, the Individual Defendants caused the Company to repurchase 11,677,143 shares of its own common stock at an average price per share of $27.90, for a total cost to the Company of approximately $325.8 million.

148.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $2.58 more than the actual worth of each share during the month of May 2017. Thus, the total over payment by the Company for repurchases of its own stock during May 2017 was approximately $30.1 million.

149.    According to the Company's Form 10-Q filed with the SEC on July 28, 2017, in the month of June 2017, the Individual Defendants caused the Company to repurchase 4,019,033

shares of its own common stock at an average price per share of $27.92, for a total cost to the Company of approximately $112.2 million.

150.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $2.60 more than the actual worth of each share during the month of June 2017. Thus, the total over payment by the Company for repurchases of its own stock during June 2017 was approximately $10.4 million.

151.    According to the Company's Form 10-Q filed with the SEC on October 26, 2017, in the month of July 2017, the Individual Defendants caused the Company to repurchase 6,543,656 shares of its own common stock at an average price per share of $30.52, for a total cost to the Company of approximately $199.7 million.

152.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $5.20 more than the actual worth of each share during the month of July 2017. Thus, the total over payment by the Company for repurchases of its own stock during July 2017 was approximately $34 million.

153.    According to the Company's Form 10-Q filed with the SEC on October 26, 2017, in the month of August 2017, the Individual Defendants caused the Company to repurchase 6,321,552 shares of its own common stock at an average price per share of $30.22, for a total cost to the Company of approximately $191 million.

154.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.90 more than the actual worth of each share during the month of August 2017. Thus,

Verified Shareholder Derivative Complaint

the total over payment by the Company for repurchases of its own stock during August 2017 was approximately $31 million.

155. According to the Company's Form 10-Q filed with the SEC on October 26, 2017, in the month of September 2017, the Individual Defendants caused the Company to repurchase 34,322 shares of its own common stock at an average price per share of $29.02, for a total cost to the Company of approximately $996,024.

156. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $3.70 more than the actual worth of each share during the month of September 2017. Thus, the total over payment by the Company for repurchases of its own stock during September 2017 was approximately $126,991.

157. According to the Company's Form 10-K filed with the SEC on February 22, 2018, in the month of October 2017, the Individual Defendants caused the Company to repurchase 707 shares of its own common stock at an average price per share of $30.99, for a total cost to the Company of approximately $21,909.

158. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $5.67 more than the actual worth of each share during the month of October 2017. Thus, the total over payment by the Company for repurchases of its own stock during October 2017 was approximately $4,009.

159. According to the Company's Form 10-K filed with the SEC on February 22, 2018, in the month of November 2017, the Individual Defendants caused the Company to repurchase

7,868,289 shares of its own common stock at an average price per share of $34.18, for a total cost to the Company of approximately $268.9 million.

160.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $8.86 more than the actual worth of each share during the month of November 2017. Thus, the total over payment by the Company for repurchases of its own stock during November 2017 was approximately $69.7 million.

161.    According to the Company's Form 10-K filed with the SEC on February 22, 2018, in the month of December 2017, the Individual Defendants caused the Company to repurchase 4,333,075 shares of its own common stock at an average price per share of $37.17, for a total cost to the Company of approximately $161 million.

162.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $11.85 more than the actual worth of each share during the month of December 2017. Thus, the total over payment by the Company for repurchases of its own stock during December 2017 was approximately $51.3 million.

163.    According to the Company's Form 10-Q filed with the SEC on April 26, 2018, in the month of January 2018, the Individual Defendants caused the Company to repurchase 7,244,799 shares of its own common stock at an average price per share of $39.78, for a total cost to the Company of approximately $288.2 million.

164.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $14.46 more than the actual worth of each share during the month of January 2018. Thus,

the total over payment by the Company for repurchases of its own stock during January 2018 was approximately $104.8 million.

165.     According to the Company's Form 10-Q filed with the SEC on April 26, 2018, in the month of February 2018, the Individual Defendants caused the Company to repurchase 3,157,902 shares of its own common stock at an average price per share of $38.64, for a total cost to the Company of approximately $122 million.

166.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $13.32 more than the actual worth of each share during the month of February 2018. Thus, the total over payment by the Company for repurchases of its own stock during February 2018 was approximately $42.1 million.

167.     According to the Company's Form 10-Q filed with the SEC on April 26, 2018, in the month of March 2018, the Individual Defendants caused the Company to repurchase 1,957 shares of its own common stock at an average price per share of $35.20, for a total cost to the Company of approximately $68,886.

168.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $9.88 more than the actual worth of each share during the month of March 2018. Thus, the total over payment by the Company for repurchases of its own stock during March 2018 was approximately $19,335.

169.     According to the Company's Form 10-Q filed with the SEC on July 27, 2018, in the month of April 2018, the Individual Defendants caused the Company to repurchase 6,280,817

shares of its own common stock at an average price per share of $34.29, for a total cost to the Company of approximately $215.4 million.

170.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $8.97 more than the actual worth of each share during the month of April 2018. Thus, the total over payment by the Company for repurchases of its own stock during April 2018 was approximately $56.3 million.

171.    According to the Company's Form 10-Q filed with the SEC on July 27, 2018, in the month of May 2018, the Individual Defendants caused the Company to repurchase 7,924,541 shares of its own common stock at an average price per share of $35.49, for a total cost to the Company of approximately $281.2 million.

172.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $10.17 more than the actual worth of each share during the month of May 2018. Thus, the total over payment by the Company for repurchases of its own stock during May 2018 was approximately $80.6 million.

173.    According to the Company's Form 10-Q filed with the SEC on October 25, 2018, in the month of July 2018, the Individual Defendants caused the Company to repurchase 7,702,315 shares of its own common stock at an average price per share of $32.74, for a total cost to the Company of approximately $252.2 million.

174.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.42 more than the actual worth of each share during the month of July 2018. Thus, the

total over payment by the Company for repurchases of its own stock during July 2018 was approximately $57.2 million.

175.    According to the Company's Form 10-Q filed with the SEC on October 25, 2018, in the month of August 2018, the Individual Defendants caused the Company to repurchase 12,827,329 shares of its own common stock at an average price per share of $30.82, for a total cost to the Company of approximately $395.3 million.

176.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $5.50 more than the actual worth of each share during the month of August 2018. Thus, the total over payment by the Company for repurchases of its own stock during August 2018 was approximately $70.6 million.

177.    According to the Company's Form 10-Q filed with the SEC on October 25, 2018, in the month of September 2018, the Individual Defendants caused the Company to repurchase 10,978,299 shares of its own common stock at an average price per share of $32.24, for a total cost to the Company of approximately $353.9 million.

178.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.92 more than the actual worth of each share during the month of September 2018. Thus, the total over payment by the Company for repurchases of its own stock during September 2018 was approximately $76 million.

179.    In total, the Company overpaid an aggregate amount of approximately $805.1 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO SYNCHRONY

180.    As a direct and proximate result of the Individual Defendants' conduct, Synchrony has lost and expended, and will lose and expend, many millions of dollars.

181.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, the Walmart Action filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

182.    Such losses include, but are not limited to, approximately $805.1 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

183.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

184.    As a direct and proximate result of the Individual Defendants' conduct, Synchrony has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

185.    Plaintiff brings this action derivatively and for the benefit of Synchrony to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Synchrony, waste of corporate assets, unjust

enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

186.    Synchrony is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

187.    Plaintiff is, and has been continuously at all relevant times, a shareholder of Synchrony. Plaintiff will adequately and fairly represent the interests of Synchrony in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

188.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

189.    A pre-suit demand on the Board of Synchrony is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine Individual Defendants: Defendants Keane, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe (the "Directors").  Plaintiff needs only to allege demand futility as to five of the nine Directors who were on the Board at the time this action was commenced.

190.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to overpay for repurchases of its own stock and one of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

191.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

192.    Additional reasons that demand on Defendant Keane is futile follow. Defendant Keane has served as the Company's President and CEO since February 2014 and as a Company director since 2013.   Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Keane with her principal occupation, and she receives handsome compensation, including $13,525,503 in fiscal 2017. Defendant Keane was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, most of which she personally made statements in, and the 2016 10-K, which she signed and signed a SOX certification for. As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales before the fraud was exposed, which yielded at least $1.2 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Moreover, Defendant Keane is a defendant in the Securities Class Action. For these reasons, too, Defendant Keane breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

193.     Additional reasons that demand on Defendant Alves is futile follow. Defendant Alves has served as a Company director since November 2015 and serves a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Defendant Alves receives handsome compensation, including $246,043 in fiscal 2017. As a trusted Company director and member of the Audit Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Alves signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Alves breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.     Additional reasons that demand on Defendant Coviello is futile follow. Defendant Coviello has served as a Company director since November 2015 and serves as a member of the Risk Committee.  Defendant Coviello receives handsome compensation, including $228,043 in fiscal 2017. As a trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Coviello signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Coviello breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.     Additional reasons that demand on Defendant Graylin is futile follow. Defendant Graylin has served as a Company director since November 2015 and serves as a member of the

Risk Committee. Defendant Graylin receives handsome compensation, including $228,043 in fiscal 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Graylin signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Graylin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.     Additional reasons that demand on Defendant Guthrie is futile follow. Defendant Guthrie has served as a Company director since July 2014, and serves as Chair of the Risk Committee. Defendant Guthrie receives handsome compensation, including $263,043 in fiscal 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Guthrie signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Guthrie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.     Additional reasons that demand on Defendant Hartnack is futile follow. Defendant Hartnack has served as a Company director since July 2014, and serves as Chair of the Management Development and Compensation Committee. Defendant Hartnack receives handsome compensation, including $477,117 in fiscal 2017. As a long-time Company director he

conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hartnack signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Hartnack breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198. Additional reasons that demand on Defendant Naylor is futile follow. Defendant Naylor has served as a Company director since July 2014 and serves as Chair of the Audit Committee and as a member of the Management Development and Compensation Committee. Defendant Naylor receives handsome compensation, including $279,043 in fiscal 2017. As a long-time Company director and Chair of the Audit Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Naylor signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Naylor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199. Additional reasons that demand on Defendant Richie is futile follow. Defendant Richie has served as a Company director since November 2015, and serves as a member of the Nominating and Corporate Governance Committee and the Management Development and Compensation Committee. Defendant Richie receives handsome compensation, including

$236,043 in fiscal 2017. As a trusted Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Richie signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Richie breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Snowe is futile follow. Defendant Snowe has served as a Company director since November 2015, and serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Snowe receives handsome compensation, including $266,043 in fiscal 2017. As a trusted Company director and member of the Audit Committee she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Snowe signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Snowe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.    Additional reasons that demand on the Board is futile follow.

202.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have

longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

203.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

204.    Synchrony has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Synchrony any part of the damages Synchrony suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

205.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising

independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

206.     The acts complained of herein constitute violations of fiduciary duties owed by Synchrony officers and directors, and these acts are incapable of ratification.

207.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Synchrony. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Synchrony, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

208.     If there is no directors' and officers' liability insurance, then the Directors will not cause Synchrony to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

209.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

212.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

213.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

214.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) Synchrony was engaged in the Underwriting Misconduct; (2) Synchrony set inadequate reserves for probable loan losses; (3) the Company's relaxed underwriting practices led to a deterioration in the credit quality of its loan portfolios; (4) the Company anticipated significant charge-offs across its whole portfolio; (4) Synchrony overstated its net earnings; (5) the Company's significant changes in its underwriting guidelines between mid-2016 and the beginning of 2017 negatively impacted its relationships with key retail partners; and (6) the Company failed to maintain internal controls.

215.    Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) the Company failed to maintain disciplined or consistent underwriting practices; (2) Synchrony made significant changes to its underwriting practices, including limiting credit line increases, modifying its new account acquisition strategies, and lowering existing credit lines; (3) Synchrony's new underwriting practices dissatisfied key retail partners, including Walmart and thus damaged the Company's relationships with key retail partners; (4) the Company's partnership with Walmart was in jeopardy as a result of the Company's underwriting changes; and (5) the Company failed to maintain internal controls.

216.    The Individual Defendants also caused the 2017 and 2018 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

217.     The 2017 and 2018 Proxy Statements stated that the Company has "adopted a Code of Conduct that applies to anyone who works for or represents Synchrony, including all directors, officers and employees."  The 2017 and 2018 Proxy Statements were also false and misleading because, despite assertions to the contrary, Synchrony's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

218.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 and 2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 and 2018 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

219.     The false and misleading elements of the 2017 and 2018 Proxy Statements led to the re-election of Defendants Keane, Alves, Coviello, Graylin, Guthrie, Hartnack, Naylor, Richie, and Snowe, which allowed them to continue breaching their fiduciary duties to Synchrony.

220.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 and 2018 Proxy Statements.

221.     Plaintiff on behalf of Synchrony has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b)
### and Rule 10b-5 of the Exchange Act

222.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Synchrony. Not only is Synchrony now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Synchrony by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase billions of dollars of its own shares on the open market at artificially-inflated prices, damaging Synchrony.

224.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

225.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Synchrony not misleading.

226.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated

by Synchrony. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

227.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and/or signed the Company's Form 10-Ks and/or 10-Qs filed with the SEC during the Relevant Period.

228.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

229.    Plaintiff on behalf of Synchrony has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Exchange Act

230.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.    The Individual Defendants, by virtue of their positions with Synchrony and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Synchrony and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and

influence and exercised the same to cause Synchrony to engage in the illegal conduct and practices complained of herein.

232.    Plaintiff on behalf of Synchrony has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Synchrony's business and affairs.

235.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

236.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Synchrony.

237.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Underwriting Misconduct.

238.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

239.    Also in breach of their fiduciary duties owed to Synchrony, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) Synchrony was engaged in the Underwriting Misconduct;

(2) Synchrony set inadequate reserves for probable loan losses; (3) the Company's relaxed underwriting practices led to a deterioration in the credit quality of its loan portfolios; (4) the Company anticipated significant charge-offs across its whole portfolio; (4) Synchrony overstated its net earnings; (5) the Company's significant changes in its underwriting guidelines between mid-2016 and the beginning of 2017 negatively impacted its relationships with key retail partners; and (6) the Company failed to maintain internal controls.

240.    The Individual Defendants, in further breach of their fiduciary duties, subsequently made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company failed to maintain disciplined or consistent underwriting practices; (2) Synchrony made significant changes to its underwriting practices, including limiting credit line increases, modifying its new account acquisition strategies, and lowering existing credit lines; (3) Synchrony's new underwriting practices dissatisfied key retail partners, including Walmart and thus damaged the Company's relationships with key retail partners; (4) the Company's partnership with Walmart was in jeopardy as a result of the Company's underwriting changes; and (5) the Company failed to maintain internal controls.

241.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

242.    In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach

of their fiduciary duties, caused the Company to engage in repurchasing over $3.5 billion worth of Company stock at artificially inflated prices.

243.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

244.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

245.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

246.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Synchrony has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

247.     Plaintiff on behalf of Synchrony has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

248.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Synchrony.

250.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Synchrony that was tied to the performance or artificially inflated valuation of Synchrony, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

251.     Plaintiff, as a shareholder and a representative of Synchrony, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

252.     Plaintiff on behalf of Synchrony has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

Verified Shareholder Derivative Complaint

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

255.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

256.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

257.    Plaintiff on behalf of Synchrony has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Synchrony, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Synchrony;

(c)    Determining and awarding to Synchrony the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Synchrony and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Synchrony and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the shareholders of Synchrony to nominate at least five candidates for election to the Board; and

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Synchrony restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

Verified Shareholder Derivative Complaint

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: January 28, 2019                    Respectfully submitted,


                                           **FAXON LAW GROUP, LLC**


                                            **//s// Eric P. Smith (ct16141)**_____
                                           Eric P. Smith
                                           59 Elm Street
                                           New Haven, CT 06510
                                           Telephone: (203) 624-9500
                                           Facsimile: (203) 624-9100
                                           Email: esmith@faxonlawgroup.com

                                           **THE ROSEN LAW FIRM, P.A.**
                                           Phillip Kim
                                           275 Madison Avenue, 34th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: pkim@rosenlegal.com

                                           **THE BROWN LAW FIRM, P.C.**
                                           Timothy Brown
                                           240 Townsend Square
                                           Oyster Bay, NY 11771
                                           Telephone: (516) 922-5427
                                           Facsimile: (516) 344-6204
                                           Email: tbrown@thebrownlawfirm.net

                                           *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: 580EF580-6B9E-47B0-A5BC-BEAF757C68E0

## VERIFICATION

I, Jeffrey Gilbert  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this   th day of January 2019.

1/17/2019

Jeffrey Gilbert